# Exhibit 1

U. S. Equal Employment Opportunity Commission
Pittsburgh Area Office

**JULIET JONES,**

      Charging Party,                    EEOC Charge No. 530-2023-00305

v.

**METRO ONE LOSS PREVENTION
SERVICES GROUP, INC.**

      Respondent.

## AMENDED CHARGE OF DISCRIMINATION

1. I am the Charging Party, Juliet Jones. The contact information for myself and my legal counsel is as follows:

   | | |
   |---|---|
   | **Juliet Jones** | **David Manes, Esq.** |
   | 1425 Crooked Hill Road | MANES & NARAHARI, LLC |
   | #61764 | 301 Grant St, Suite 270 |
   | Harrisburg, Pa 17106 | Pittsburgh, PA 15219 |
   | Jjones@certifiedhrexperts.com | (412) 626-5570 Direct |
   | DOB: 11/25/1973 | (412) 650-4845 Fax |
   | Race: Bi-racial | dm@manesnarahari.com |

2. Respondent is Metro One Loss Prevention Services Group, Inc. I worked remotely, but the corporate address for Respondent is 5830 Granite Parkway, Suite 100-353, Plano, TX 75024.

3. Kelli Springfield, an employee for Respondent in the Human Resources Department is aware of the filing of an EEOC Charge and said to contact her.

4. Kelli can be contacted at kspringfield@metroonelpsg.com and (972) 465-0755.

5. I was hired as a Recruiter with Respondent to hire unarmed security guards for their client, Amazon.

6. Two recruiters on my team were to train me but did not do so properly

7. My manager was Cody Husken.

8. Husken's boss was Raymond Cox, the Performance Manager.

9. Staff were afraid to speak to Cox about communication issues, ways to streamline productivity, etc.

10. I, however, spoke up against procedures being followed improperly.

11. Members of my team were hiring security guards with incomplete paperwork such as I-9's.

12. Prior to a security guard starting, we were to have applicants fill out their I-9's and W4 as well as have a completele4d background check.

13. I followed these rules.

14. During the week of September 20, 2022, Cox wanted to replace Husken, sharing that he felt like Husken was "checking out" because he was planning on moving with his girlfriend to another state.

15. Cox asked me to find Husken's replacement.

16. I sent applicants to Cox to interview and scheduled the interviews.

17. At the same time, Cox told me about the job and indicated/insinuated that "it was mine if I wanted it".

18. Cox to me he wanted someone he could trust in this position and would prefer a female over a male.

19. Due to the hours and workload this role would offer, such as working over 40 hours a week, being on call 24/7, and working as a recruiter and account manager, I declined the verbal offer.

20. After turning down the offer, Cox was short with me on the phone and in meetings. Our conversations went from being friendly to strictly business.

21. Husken had started to be short with me as well.

22. I began getting emails accusing me of not doing my work properly.

23. I had to spend time to show that I was and provide examples that I was doing what I was accused of not doing.

24. One example of this is the RDG1 site being assigned to a different recruiter and I being assigned to assist not take over.

25. I was working at my sites. At this time, the Bethel location was heavily understaffed.

26. I was then assigned to work Bethel, my own sites (York, Lewisberry, Carlisle), and help the other recruiter.

27. In addition to this workload, I was asked to do a one off and hire for a new client as well as find Husken's replacement.

28. I was working until 8 p.m. most nights in an attempt to meet unreasonable expectations.

29. I did meet the expectations by fully staffing my sites and hiring two people for the new client, and finding Husken's replacement.

30. I kept a spreadsheet of all my efforts and hires that I sent to Cox every Wednesday and Friday.

31. Cox began to nitpick at my work and hires as if he was "looking for something".

32. I went from receiving emails tell me that I'm doing a great job to being accused of not doing my job.

33. I received an email from Cox accusing me of hiring someone that wasn't finishing with the onboarding.

34. I responded saying that person's onboarding had been completed.

35. Sites were removed from my supervision.

36. I was informed not to hire anyone for site RDG1 for two days. However, on day three the site was given back to me on a Wednesday.

37. I was told the site had to be fully staffed by Sunday. I work Monday through Friday.

38. Human Resources gives a spreadsheet to the managers to fill out.

39. Husken gave me his spreadsheet and told me to do it.

40. This sheet contained all of the hires before I was hired who had been working with unfinished paperwork in the system, such as unfinished I-9 forms.

41. I was asked to immediately get the issues fixed while my sites have been removed from me.

42. On a daily basis I had to ask f I was allowed to hire people, the work I was to be performing, because my job duties had become unclear.

43. I was being assigned Manager work as a recruiter.

44. I was also told that meetings for me were optional for me to attend when meetings her mandatory before.

45. During a meeting I attended, I was overlooked. I usually open Thursday meetings for my team with my recruiting stats.

46. I also received emails stating that I mislabeled an employee named Jessica Strove as a supervisor. When I checked the system, it showed that I had entered her as an unarmed security guard.

47. On another occasion, I hired a man named Johnny Bonificia. I completed his onboarding.

48. However, my name was removed for the credit of hiring and onboarding Bonificia and the credit was given to another recruiter.

49. I addressed this with the recruiter and with Cox before I could change the system back to saying I was the recruiter.

50. Both the recruiter and Cox were aware that I had hired him.

51. This happened after I addressed Cox about the retaliation and change in environment since turning down the promotion, he offered me.

52. I started to get depressed and anxious.

53. I scheduled a doctor appointment for October 21, 2022 to have my heart and stress levels checked.

54. I also informed Cox that I had a surgery scheduled and needed to discuss my days off and possibly an ADA accommodation.

55. Cox rushed me off the phone and then sent me an email referring me to HR.

56. I reached out to HR on October 11, 2022 and did not hear back.

57. On October 14, 2022, I reached out to Husken for clarity on what work I am supposed to do and what the process of that work is. I did not hear back from him.

58. I went from being stellar employee to being demoted.

59. Another recruiter, Kendrix, had been promoted as well as another recruiter, Shamyah, being promoted to Lead Recruiter.

60. I was not offered the Lead Recruiter role and had only found out about it in an email on October 14, 2022.

61. I believe Respondent retaliated and discriminated against me based on my race in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act of 1955.

62. I believe Respondent retaliated and discriminated against me based on my sex in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act of 1955.

63. I believe I was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act of 1955.

64. I want this Charge cross-filed with the PHRC and investigated by the EEOC.

65. I wish to take part in an EEOC mediation.

66. I swear, subject to penalty of perjury, that the foregoing is true and accurate to the best of my knowledge.

12/09/2022
Date

Juliet Jones